**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **GERALD HOLLEN**, individually, and on behalf of all others similarly situated, | : CIVIL ACTION<br>:<br>: No.:<br>: Hon. |
| Plaintiffs, | : |
| v. | : |
| **BIMBO BAKERIES USA, INC.**, | : |
| Defendant. | : |

**COLLECTIVE AND CLASS ACTION
COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Gerald Hollen ("Plaintiff"), individually and on behalf of all similarly situated hourly employees (Plaintiff along with the putative members of the FLSA Collective and Rule 23 Classes are hereinafter referred to as "Plaintiffs"), by and through his undersigned attorneys, hereby brings this Collective and Class Action Complaint against Defendant, Bimbo Bakeries USA, Inc. ("Defendant"), and alleges as follows:

**INTRODUCTION**

1.      This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiff, individually and on behalf of all similarly situated hourly employees employed by Defendant, arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101, *et seq.*, and common law.

2.      Defendant is "the largest commercial baking company in the U.S.," employing "more than 20,000 associates" across the country who produce "bread, buns, bagels, English Muffins and sweet baked goods[.]"[1]

---

[1] https://bimbobakeriesusa.com/ (last visited November 11, 2024); https://bimbobakeriesusa.com/about-us (last visited November 11, 2024).

3.      Defendant employs and employed thousands of hourly workers, including Plaintiffs, to facilitate its operations.

4.      Plaintiffs are and were employed at one of Defendant's 55 manufacturing facilities across the United States, including, but not limited to Commerce City, Colorado; Orlando, Florida; Elkhart, Indiana; Roseville, Minnesota; Albany, New York; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; West Hazelton, Pennsylvania; Williamsport, Pennsylvania; Kent, Washington; Huntington, West Virginia; and Oconomowoc, Wisconsin; among others.[2]

5.      Defendant required Plaintiffs to wear company-issued uniforms and protective clothing during their work shifts to comply with company policies, as well as food-safety and health regulations.

6.      The company-issued protective clothing and safety gear included button up pants, a long sleeve shirt with snaps down the middle, steel-toed safety shoes, bump hats, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, earplugs, and safety glasses (hereinafter, this personal protection equipment will be collectively referred to as "the PPE").[3]

7.      Defendant required Plaintiffs to change into ("don") and change out of ("doff") the PPE before and after their work shifts in designated locations at Defendant's manufacturing facilities.

8.      The process of donning and doffing the PPE was compensable because Defendant

---

[2] https://www.bimbobakeriesusa.com/our-history (last visited November 15, 2024); https://www.bimboqsr.com/en/our-global-bakeries (last visited November 15, 2024).
[3] The exact required PPE may vary slightly from department to department and facility to facility, however, the PPE required was either the same or substantially similar across all departments and facilities. All of Defendant's hourly employees across departments and facilities were required to wear an array of PPE, including button up pants, a long sleeve shirt with snaps down the middle, steel-toed safety shoes, bump hats, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, earplugs, and safety glasses.

required Plaintiffs to don and doff at the worksite and because government regulations required Plaintiffs to wear the PPE during their work shifts and to don and doff the PPE at the worksite.

9.      Additionally, the PPE was an integral and indispensable part of the Plaintiffs' principal work activities, as the Plaintiffs could not safely or lawfully perform their work activities without wearing the PPE.

10.     Plaintiffs spent substantial amounts of time each day donning and doffing the PPE and walking to and from the locker rooms and the production areas before and after their work shifts.

11.     Defendant, however, did not pay the Plaintiffs for all of this time. Instead, Defendant only paid Plaintiffs based on their "punch in" and "punch out" times. As Plaintiffs were required to don their PPE before they "punched in," and required to be fully dressed and ready to work at the beginning of their scheduled shift time, and likewise, doff their PPE after they "punched out," Plaintiffs were not paid for the time they spent donning and doffing the PPE. All of the time Plaintiffs spent donning and doffing the PPE was "off the clock."

12.     Consequently, Defendant failed to pay Plaintiffs for all compensable time, including overtime.

13.     Defendant required Plaintiffs to don and doff the same or substantially similar PPE, and Defendant compensated Plaintiffs in the same or similar manner.

14.     The Named Plaintiff seeks to represent current and former hourly employees who work(ed) for Defendant at one of Defendant's 55 manufacturing facilities across the United States, including, but not limited to Commerce City, Colorado; Orlando, Florida; Elkhart, Indiana; Roseville, Minnesota; Albany, New York; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; West Hazelton, Pennsylvania; Williamsport, Pennsylvania; Kent, Washington; Huntington, West

Virginia; and Oconomowoc, Wisconsin, among others and who are/were required to don and doff protective clothing and safety gear before the start of, during, and/or after the end of their work shifts. Hourly employee positions at Defendant's manufacturing facilities include, but are not limited to, employees holding the following positions: Production Associates, Warehouse Associates, Sanitation Associates, Maintenance Associates, Machine Operators, Maintenance Technicians, Maintenance Clerks, and Line Leads.[4]

15.     Defendant knew or could have easily determined how long it took Plaintiffs to complete their donning and doffing, and Defendant could have properly compensated Plaintiffs for this pre-, mid-, and post-shift work, but deliberately chose not to.

16.     Defendant's practice of failing to compensate Plaintiffs for all hours worked violated their rights under the FLSA.

17.     Defendant is liable for its failure to pay the Plaintiffs at the correct overtime rate for all hours worked in excess of 40 per week.

18.     Employees who elect to participate in this FLSA collective action seek compensation for all off-the-clock and uncompensated work performed for Defendant, and compensation at the appropriate overtime rate for all hours worked in excess of 40 per week, an equal amount for liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

19.     Plaintiff seeks a declaration that his rights, and the rights of the putative collective/class members were violated as well as an award of unpaid wages, liquidated damages, injunctive and declaratory relief, attendant penalties, and attorneys' fees and costs to make them whole for damages they suffered, and to ensure that Defendant will not subject them or future

---

[4] https://careers.bimbobakeriesusa.com/careers (last visited November 15, 2024).

workers to such illegal conduct in the future.

## JURISDICTION

20. This Court has subject matter jurisdiction over Plaintiff's FLSA claim under 28 U.S.C. § 1331 because Plaintiff's claim raises a federal question under 29 U.S.C. § 201 *et seq.*

21. Additionally, this Court has jurisdiction over Plaintiff's FLSA claim under 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

22. The FLSA applies in this case on an enterprise basis because Defendant's annual sales exceed $500,000, and Defendant has more than two employees. The FLSA applies in this case on an individual basis because Defendant's employees, including Plaintiff, engage in interstate commerce or in the production of goods for commerce.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because the state law claims and the federal claim are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

24. This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## VENUE

25. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and a substantial portion of the events that give rise to the Plaintiff's claims occurred in this District.

26. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

## PARTIES

27.    Plaintiff Gerald Hollen is a Pennsylvania resident who has worked for Defendant as an hourly employee at Defendant's Carlisle, Pennsylvania manufacturing facility from approximately April 2018 through February, 2024. Defendant most recently paid Plaintiff $25.65 per hour, plus various non-discretionary bonuses. *See* **Exhibit A**, Plaintiff's April 28, 2023 Earnings Statement. Throughout his employment with Defendant, Plaintiff typically worked up to 40 or more hours per week and has worked overtime during numerous workweeks. Plaintiff signed a consent form to join this collective action lawsuit. **Exhibit B**.

28.    Defendant employed additional putative Collective and Class Members as hourly employees in Colorado, Florida, Indiana, Minnesota, New York, Oklahoma, Pennsylvania, Washington, West Virginia, Wisconsin, and potentially other states during the past three years, and their consent forms will also be filed in this case.

29.    Defendant Bimbo Bakeries USA, Inc. is a Delaware corporation with a principal place of business at 255 Business Center Drive, Horsham, Pennsylvania 19044. Its registered agent for service of process is the Corporation Service Company, 2595 North Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.

## GENERAL ALLEGATIONS

### A.    Defendant's Operations and Manufacturing Facilities

30.    Defendant is "the largest commercial baking company in the U.S.," employing "more than 20,000 associates" across the country who produce "bread, buns, bagels, English Muffins and sweet baked goods[.]"[5]

---

[5] https://bimbobakeriesusa.com/ (last visited November 11, 2024); https://bimbobakeriesusa.com/about-us (last visited November 11, 2024).

31.    Defendant employs or employed thousands of hourly employees, including Plaintiffs, to facilitate its operations.

32.    Plaintiffs are and were employed as hourly employees at one of Defendant's 55 manufacturing facilities across the United States, including, but not limited to Commerce City, Colorado; Orlando, Florida; Elkhart, Indiana; Roseville, Minnesota; Albany, New York; Oklahoma City, Oklahoma; Carlisle, Pennsylvania; West Hazelton, Pennsylvania; Williamsport, Pennsylvania; Kent, Washington; Huntington, West Virginia; and Oconomowoc, Wisconsin, among others.[6]

**B.    Defendant Required Plaintiffs to Utilize Company-Issued PPE during their Work Shifts in Order to Comply with Company Policies, as well as Food Safety and Health Regulations**

33.    Due to food-safety and quality standards inherent in Defendant's operations, Defendant required Plaintiffs to wear company-issued PPE during their work shifts and to comply with company policies and food-safety and health regulations.

34.    The company-issued protective clothing and safety gear included button up pants, a long sleeve shirt with snaps down the middle, steel-toed safety shoes, bump hats, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, earplugs, and safety glasses.[7]

35.    Defendant required Plaintiffs to don and doff the PPE before and after their work shifts in designated locations at Defendant's manufacturing facilities.

---

[6] https://careers.bimbobakeriesusa.com/careers (last visited November 15, 2024; https://bimbobakeriesusa.com/ (last visited November 11, 2024); https://bimbobakeriesusa.com/about-us (last visited November 11, 2024).
[7] The exact required PPE may vary slightly from department to department and facility to facility, however, the PPE required was either the same or substantially similar across all departments and facilities. All of Defendant's hourly employees across departments and facilities were required to wear an array of PPE, including button up pants, a long sleeve shirt with snaps down the middle, steel-toed safety shoes, bump hats, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, earplugs, and safety glasses.

36.    Defendant prohibited Plaintiffs from donning or doffing the PPE at home.

37.    Defendant prohibited Plaintiffs from taking the PPE home with them or otherwise removing the PPE from Defendant's manufacturing facilities.

38.    Defendant furnished Plaintiffs with freshly laundered and/or new protective clothing each workday.

39.    Defendant prohibited Plaintiffs from leaving the locker room and walking to the production areas without wearing their PPE.

40.    Defendant prohibited Plaintiffs from entering certain areas of the manufacturing facilities without wearing the appropriate PPE.

41.    Defendant prohibited Plaintiffs from leaving the production areas and walking back to the locker rooms without wearing their PPE.

42.    Defendant prohibited Plaintiffs from leaving the facilities without doffing the PPE and changing into different footwear.

43.    Plaintiffs spent substantial amounts of time each day donning and doffing the PPE and walking to and from the locker rooms and the production areas before, during, and after their work shifts.

44.    Defendant, however, did not pay Plaintiffs for all of this time.

45.    Instead, Defendant paid Plaintiffs based on their "punch-in" and "punch-out" times, not the time that Plaintiffs performed their first and last principal activities of the workday

46.    Consequently, Defendant did not pay Plaintiffs for all compensable time, including overtime.

**C.    <u>Pre-Shift Donning and Walking Activities</u>**

47.    Before their scheduled shifts, Plaintiffs were required to undertake the following

essential work tasks in chronological order:

- Upon arriving at their respective facility, Plaintiffs were required to "badge-in" to the facility, swiping their security key-fob at the employee entrance before walking inside the building.

- Plaintiffs next walked down two hallways to get to the break room, where employees deposited their lunches before their shifts. Once the employees dropped off their lunches in the break room, they proceeded down two more hallways to a uniform locker room.

- Defendant maintained a uniform locker room in which Plaintiffs each had their own uniform locker. Defendant laundered and deposited two to five uniforms into each Plaintiff's uniform locker each week. Plaintiff kept a lock on his uniform locker, which he unlocked with a key. Once employees retrieved their freshly-laundered uniforms that they would wear that day (a work-shirt and work pants) from their uniform locker, they exited the uniform locker room and carried their uniforms down two more hallways to a separate locker room where employees each had their own personal lockers.

- Once Plaintiffs arrived in the locker room, they proceeded to their personal lockers. Plaintiffs unlocked their combination locks on their personal lockers, and next removed their shoes, changed out of their street clothes, stowed their personal items in their lockers, and put on their company-issued work shirts and work pants.

- Plaintiffs kept their steel-toed safety shoes, bump caps, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, ear plugs, and safety goggles, inside their personal lockers. After lacing up their company-issued safety shoes and donning their bump caps, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, ear plugs, and safety goggles, Plaintiffs locked the combination locks on their personal lockers and exited the locker room, traversing back towards the timeclocks near their respective work areas.

- Defendant permitted Plaintiffs to "punch-in" 20 minutes prior to their scheduled shifts. Around this time, Plaintiffs would line up and wait near Defendant's timeclocks until they were permitted to "punch in."

- Prior to "punching in," Plaintiffs were required to use lint rollers and lint roll their uniforms, removing any lint or dust from their clothes prior to their shifts.

- Once this entire above-described process was completed, Plaintiffs finally "punched-in" and proceeded to their pre-shift "huddle" meetings.

48. The pre-shift donning and walking process took Plaintiffs substantial time on a daily basis, ranging from 20 to 25 minutes per shift, and occurred before the beginning of their scheduled shift start times, and before Plaintiffs were permitted to "punch in."

49. Defendant, however, did not pay Plaintiffs for the work time spent donning and

walking. Instead, Defendant only paid Plaintiffs based on their "punch-in" and "punch-out" times, not the time that Plaintiffs performed their first and last principal activities of the workday.

50.    Consequently, Plaintiffs performed pre-shift work in the range of 20 to 25 minutes per shift.

**D.    <u>Mid-shift Walking, Doffing, and Donning Activities</u>**

51.    Defendant also required Plaintiffs to don and doff the PPE during their lunch period, in designated locations at Defendant's manufacturing facility.

52.    Defendant provided Plaintiffs with an unpaid 30minute lunch break. However, Defendant required Plaintiffs to be back on the production floor immediately at the conclusion of their lunch break, so it was necessary for Plaintiffs to return from their lunch break early in order to "don" their PPE and return to their respective workstations in order to comply with Defendant's timekeeping policies.

53.    During Plaintiffs' lunch breaks, Plaintiffs were required to undertake the following principal work tasks in chronological order:

- Once Plaintiffs stepped out of the production area or their respective work areas, Plaintiffs then had to walk through numerous hallways to get back to their respective locker rooms.

- Once inside the locker room, Plaintiffs unlocked their personal lockers' combination locks. Plaintiffs then removed their steel-toed safety shoes, bump caps, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, ear plugs, and safety goggles, placed those items inside their personal lockers, and put on their street or personal shoes. Plaintiffs then locked their combination locks on their personal lockers and exited the locker rooms, traversing back through numerous hallways to the break room to begin their lunch break.

- Towards the end of their lunch break period, Plaintiffs were then required to traverse back to their personal lockers, unlock their locker's combination lock, and don their PPE again (through the same process described above).

- After donning their PPE, Plaintiffs locked the combination lock on their personal lockers and traversed back to their respective workstations, making sure they were abiding by Defendant's timekeeping policies and at their respective workstations, donned in their PPE, prior to the conclusion of their 30-minute lunch break.

54.     The mid-shift walking, doffing, and donning process at Defendant's facility took substantial time on a daily basis, ranging from approximately 6 to 8 minutes per shift.

55.     Plaintiff received one unpaid, 30-minute lunch break per shift.

56.     Plaintiff estimates it took between 3 to 4 minutes during his mid-shift break to walk and doff his PPE before going on break, and an additional 3 to 4 minutes per mid-shift break to walk and don his PPE once returning from break.

57.     Plaintiffs were not properly paid for this time. Pursuant to Defendant's unlawful timekeeping policies, Plaintiffs did not "punch in" or "punch out" during their 30-minute lunch breaks, Instead, Defendant would automatically deduct 30 minutes of time from each Plaintiff's total number of hours worked each shift. Consequently, because Plaintiffs were required to doff their PPE at the beginning of their lunch break, and don their PPE at the end of their lunch break, Plaintiffs were not paid for the time they spent performing these mid-shift work activities.

**E.      Post-Shift Donning and Walking Activities**

58.     After their scheduled shifts, Plaintiffs were required to undertake the following essential work tasks in chronological order:

- At the end of their scheduled shifts, Plaintiffs began to walk from their respective workstations towards the employee timeclocks. Plaintiffs next would line up with other hourly employees and "punch out" at the timeclocks, and then proceeded to the employee locker rooms.

- After entering the locker rooms, Plaintiffs proceeded to their personal lockers and unlocked their locker's combination locks. Plaintiffs next removed their steel-toed safety shoes, bump caps, beard and hair nets (or ski-mask-style headwear), cut-resistant gloves, ear plugs, and safety goggles, and placed those items inside their personal lockers. Plaintiffs also changed out of their company-issued uniforms and put on their street clothes, as well as their street or personal shoes. Plaintiffs next placed their company issued uniforms in a laundry basket inside their locker rooms.

- Plaintiffs then locked the combination locks on their personal lockers, exited the locker room, and proceeded to the break room. Once in the break room, Plaintiffs grabbed their lunch boxes and proceeded to traverse back towards the employee entrance / exit.

- Finally, Plaintiffs would exit the facility.

59.     The post-shift doffing and walking process took Plaintiffs substantial time on a daily basis, ranging from 5 to 7 minutes per shift, and occurred after the end of their scheduled shifts.

60.     Defendant, however, did not pay Plaintiffs for work spent time spent doffing and walking. Instead, Defendant only paid Plaintiffs based on their "punch-in" and "punch-out" times, not the time that Plaintiffs performed their first and last principal activities of the workday.

61.     Consequently, Plaintiffs performed post-shift work in the range of 5 to 7 minutes per shift without compensation.

**F.      Defendant's Timekeeping System Failed to Properly Account for Plaintiffs' Donning, Doffing, and Walking Activities**

62.     During their shifts, Plaintiffs time was tracked on Defendant's time-keeping system, but again, this time was based on their "punch-in" and "punch-out" times, not the time that Plaintiffs performed their first and last principal activities of the workday.

63.     Defendant required Plaintiffs to report to their work stations and begin their activities at their scheduled shift start time (e.g., 6:00 p.m.).

64.     However, as described above, due to the extensive PPE donning, doffing, and walking process, Plaintiffs spent 31 to 40 minutes per day prior to, during, and after their scheduled shift start and end times completing their required PPE donning, doffing, and walking activities.

65.     Consequently, Defendant's timekeeping system failed to account for all of the time Plaintiffs spent donning and doffing PPE.

**G.      Donning and Doffing PPE at the Worksite are Principal Work Activities and are Compensable under the FLSA**

66.     Defendant required Plaintiffs to wear the PPE during their work shifts in order to comply with company policies and food-safety and health regulations. Additionally, the PPE was

an integral and indispensable part of Plaintiffs' principal work activities, as Plaintiffs could not safely or lawfully perform their work activities without wearing the PPE.

67.    Donning and doffing protective clothing and safety gear are principal activities under the Portal-to-Portal Act, 29 U.S.C. § 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the FLSA.

68.    The determination of whether donning and doffing a safety uniform is compensable begins with *Steiner v. Mitchell*, 350 U.S. 247 (1956), the seminal case on the subject. In *Steiner*, the Supreme Court held that donning and doffing uniforms was compensable when employees were "compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employer to provide." *Id*. at 248. Under these circumstances, the Court had "no difficulty" concluding that these dress-related activities were compensable under the FLSA. *Id*. at 255.

69.    Following the Supreme Court's decision in *Steiner*, the Department of Labor ("DOL") issued regulations providing further guidance about the types of dress-related activities that are compensable under the FLSA. One such regulation, 29 C.F.R. § 790.8(c), describes "principal activity" as follows:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity.

70.    More recently, in an advisory memorandum regarding the Supreme Court's

decision in *IBP v. Alvarez*, 546 U.S. 21 (2005), the DOL reiterated its view that the FLSA requires

compensation for donning and doffing safety gear when the donning and doffing activities must

be performed at work. The DOL opined:

> Therefore, the time, no matter how minimal, that an employee is required to spend
> putting on and taking off gear on the employer's premises is compensable 'work'
> under the FLSA. … However, donning and doffing of required gear is within the
> continuous workday only when the employer or the nature of the job mandates that
> it take place on the employer's premises. It is our longstanding position that if
> employees have the option and the ability to change into the required gear at home,
> changing into that gear is not a principal activity, even when it takes place at the
> [worksite].

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at

*https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2*.

71.     In light of the Supreme Court's opinion in *Steiner*, numerous Circuit Courts have

endorsed the compensability of donning and doffing safety gear. For example, in *Tum v. Barber*

*Foods, Inc.*, 360 F.3d 274, 278 (1st Cir. 2004), the First Circuit noted with approval the district

court's opinion regarding the compensability of donning and doffing safety gear when wearing

such gear is required by the employer and/or government regulation:

> The district court found that the donning and doffing of required gear is an integral
> and indispensable part of Employees' principal activities. *See generally Steiner v.*
> *Mitchell,* 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that activities
> should be considered integral and indispensable when they are part of the principal
> activities for the particular job tasks); *Mitchell v. King Packing Co.,* 350 U.S. 260,
> 76 S.Ct. 337, 100 L.Ed. 282 (1956). We agree with the district court's conclusion
> as to the required gear. In the context of this case, Employees are required by Barber
> Foods and or government regulation to wear the gear. Therefore, these tasks are
> integral to the principal activity and therefore compensable. *See Alvarez v. IBP,*
> *Inc.,* 339 F.3d 894, 903 (9th Cir. 2003) (holding that donning and doffing which is
> both required by law and done for the benefit of employer is integral and
> indispensable part of the workday); *cf.* 29 C.F.R. § 1910.132(a).

*Id*.

72.     In *Franklin v. Kellogg Co.,* 619 F.3d 604 (6th Cir. 2010), the Sixth Circuit

considered the issue of employee compensation for time spent donning and doffing food protective

clothing and safety gear at the beginning and the end of work shifts. The protective gear at issue included hair and beard nets, safety glasses, ear plugs, and "bump caps." *Id.* at 608. The Sixth Circuit applied the *Steiner* test, asking whether the activities of donning and doffing were an "integral and indispensable" part of the principal activity of the employment. *Id.* at 619-20. The Sixth Circuit answered this question in the affirmative, reasoning that the activities were required by the manufacturer, and ensured untainted products and safe and sanitary working conditions. *Id.* at 620.

73.     In a case involving the donning and doffing of protective gear at a meat processing plant, *Alvarez v. IBP, Inc.,* 339 F.3d 894 (9th Cir. 2003), *aff'd,* 546 U.S. 21 (2005), the Ninth Circuit also applied the *Steiner* test. The court considered whether these activities of donning and doffing at the beginning and end of a work shift were "integral and indispensable" to the principal activity of the employment, inquiring whether the activities were "necessary to the principal work performed and done for the benefit of the employer." *Id.* at 902-03. The Ninth Circuit concluded that the "integral and indispensable" test set forth in *Steiner* was satisfied with regard to the donning and doffing of all the protective gear at issue. *Id.* at 903.

**H.     Plaintiffs' Walking Time is Compensable Because it Occurred After the Beginning of their First Principal Activity and Before the End of their Last Principal Activity**

74.     The time spent by Plaintiffs walking to and from the locker rooms and production areas was compensable because it occurred after their first principal activity and before their last principal activity.

75.     On appeal to the Supreme Court, the employers in *Alvarez* did not challenge the Ninth Circuit's holding that, in light of *Steiner,* donning and doffing of protective equipment is compensable under the Portal Act. *Alvarez,* 546 U.S. at 32. Instead, the employers appealed a separate ruling regarding the compensability of walking time. *Id.* The Supreme Court held that

walking time is compensable if it occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity. *Id.* at 37.

76.     In the wake of the Supreme Court's decision in *Alvarez*, the DOL issued an advisory memorandum stating, in pertinent part,

> The Supreme Court's unanimous decision in *Alvarez* holds that employees who work in meat and poultry processing plants must be paid for the time they spend walking between the place where they put on and take off protective equipment and the place where they process the meat or poultry. The Court determined that donning and doffing gear is a "principal activity" under the Portal to Portal Act, 29 U.S.C. 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq.

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2* (footnote omitted).

## I.      Defendant Breached its Contractual Obligation to Pay Plaintiffs their Regular Hourly Rates for Each Hour Worked

77.     In approximately April 2018, Defendant offered Plaintiff the opportunity to work for Defendant as an hourly employee.

78.     In consideration for Plaintiff's work as an hourly employee, Defendant promised to pay Plaintiff an hourly wage for each hour he worked for Defendant.

79.     In approximately April 2018, Plaintiff accepted Defendant's offer of employment and began working for Defendant, creating a valid contract between Defendant and Plaintiff whereby Defendant was obligated to pay Plaintiff his regular hourly rate of pay for each hour that he worked for Defendant, including the donning, doffing, and walking activities described herein.

80.     Additionally, pursuant to this contract, Defendant was obligated to pay Plaintiff his proper overtime rate for all hours worked over 40 hours in a workweek.

81.     Throughout his employment with Defendant as an hourly employee, Plaintiff

performed all of the work required by Defendant, including the donning, doffing, and walking described herein. Plaintiff also regularly worked over 40 hours in a workweek, entitling him to overtime pay. In performing this work, Plaintiff fulfilled all of his duties under the contract.

82.     However, throughout Plaintiff's entire employment with Defendant, Defendant repeatedly and systematically breached the contract by not paying Plaintiff his regular hourly rate of pay for the donning, doffing, and walking activities described herein, as well as failing to pay Plaintiff his proper overtime rate.

83.     Defendant's failure to pay Plaintiff for each hour of work he performed and that was required of him as an hourly employee, was a material breach by Defendant of the parties' contract.

84.     Because of Defendant's breaches, Plaintiff was deprived of wages owed to him under the contract, including unpaid "gap time" wages.[8]

85.     Upon information and belief, Defendant had a similar valid contact with each of the other Plaintiffs.

86.     Upon information and belief, Defendant repeatedly and systematically breached its contracts with all the Plaintiffs it employed in the same way that it breached its contract with Plaintiff.

87.     Defendant's contractual promises to pay Plaintiffs their applicable hourly rate for each hour worked and their overtime rate for overtime hours is evidenced by, among other things, earnings statement issued to the Plaintiffs.

---

[8] "Gap time" refers to time that is not covered by the FLSA's overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the FLSA's minimum wage provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their weekly wages are averaged across their actual time worked.

88.     Plaintiffs are owed wages at their contractual hourly wage rates for the time that they worked off the clock during their employment with Defendant, including unpaid "gap time" wages and overtime wages.

89.     Plaintiffs earned these wages at the moment they performed the off-the-clock work, and the wages were due to be paid to Plaintiffs no later than the pay day for the period in which the off-the-clock work was performed.

90.     According to the parties' contract, Defendant was required to pay Plaintiffs for the off-the-clock work because it constituted principal work activities that are integral and indispensable to Plaintiff's work.

91.     The fact that Defendant deliberately chose not to compensate Plaintiffs for this work, and that the off-the-clock work was performed before and after Plaintiffs' scheduled shifts, does not somehow relieve Defendant of its contractual obligations to pay the Plaintiffs for this time.

92.     Defendant was contractually obligated to pay Plaintiffs the appropriate hourly rate for *all hours worked*, including hours worked before and after their scheduled work shifts, because that is what the parties agreed to in their contract.

**J.     Defendant Benefitted from the Unpaid Donning, Doffing, and Walking Activities**

93.     At all relevant times, Defendant directed and directly benefited from the work performed by Plaintiffs in connection with the above-described pre-shift donning and walking activities, and post-shift doffing and walking activities, and was aware it was occurring off the clock and without compensation.

94.     Plaintiffs' pre-, mid-, and post-shift donning, doffing, and walking activities conferred a benefit on Defendant in that they were ready to work in the required PPE at the beginning of their shift, and doffed the required PPE after the conclusion of their shifts, and that

Defendant saved the funds it would have spent had it paid Plaintiffs for that work.

95.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiffs.

96.     At all relevant times, Defendant was able to track the amount of time Plaintiffs spent in connection with the pre-, mid-, and post-shift donning, doffing, and walking activities. However, Defendant failed to do so and failed to pay Plaintiffs for all of the work they performed.

97.     At all relevant times, Defendant used its attendance and adherence policies against Plaintiffs in order to pressure them into performing the pre-, mid-, and post-shift donning, doffing, and walking activities without pay.

98.     Defendant expressly trained and instructed Plaintiffs to begin performing the above-described pre-shift donning and walking activities *before* the start of their scheduled shifts to ensure they were prepared to engage in their work activities prior to the start of their shifts. Additionally, Defendant expressly trained and instructed Plaintiffs to begin performing the above-described post-shift doffing and walking activities *after* the end of their scheduled shifts to ensure they doffed their PPE "off the clock."

99.     At all relevant times, Defendant's policies and practices deprived Plaintiffs of wages owed for the pre-, mid-, and post-shift donning, doffing, and walking activities they performed. Because Plaintiffs regularly worked 40 hours or more per week, Defendant's policies and practices also deprived them of overtime pay.

100.    Defendant knew or should have known that the time spent by Plaintiffs in connection with the pre-, mid-, and post-shift donning, doffing, and walking activities was compensable under the law. Indeed, in light of the explicit DOL guidance and Supreme Court case law cited above, there is no conceivable way for Defendant to establish that they acted in good

faith.

101.    Despite knowing Plaintiffs performed work before, during, and after their scheduled work shifts, Defendant failed to make any effort to stop or disallow the pre-, mid-, and post-shift work and instead suffered and permitted it to happen.

102.    Depending on when the uncompensated work was performed, unpaid wages related to the pre-, mid-, and post-shift work described herein are owed to Plaintiffs at the mandated overtime premium or at their standard rate of pay.

**K.  Defendant's Regular Rate Violations**

103.    Under the FLSA, the regular rate is the "keystone" to calculating the correct overtime rate. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945).  It is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed." 29 C.F.R. §778.108.

104.    No matter how an employee is paid—whether by the hour, by the piece, on a commission, or on a salary—the employee's compensation must be converted to an equivalent hourly rate from which the overtime rate can be calculated.  29 C.F.R. §778.109. "The regular hourly rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid." *Id*.

105.    There is a statutory presumption that remuneration in any form must be included in the regular rate calculation.  Defendants carry the burden to establish that any payment should be excluded. *Acton v. City of Columbia, Mo*., 436 F.3d 969, 976 (8th Cir. 2006) (citing *Madison v. Resources for Human Dev. Inc.*, 233 F.3d 187 (3rd Cir. 2000)). Thus, determining the regular rate

starts from the premise that all payments made to Defendants' hourly employees for work performed are included in the base calculation unless specifically excluded by statute.

106.    Once the total amount of an employee's "regular" compensation is deduced, "the determination of the regular rate becomes a matter of mathematical computation." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 425 (1945). The regular rate must be expressed as an hourly rate because, although any method of compensating an employee is permitted, the FLSA imposes its overtime requirements in terms of hourly wages. Thus, if necessary, an employer must convert an employee's wages to an hourly rate to determine compliance with the statute.

107.    Plaintiff's "total remuneration" included not only his base hourly pay, but also any bonuses or shift differentials. Indeed, 29 C.F.R. § 548.502 expressly provides that "[e]xtra overtime compensation must be separately computed and paid on payments such as bonuses or shift differentials which are not included in the computation of the established basic rate…."; *see also* 29 C.F.R. §778.207(b) (Under FLSA, the regular rate of pay must consist of all forms of remuneration including non-discretionary bonuses and "such extra premiums as night shift differentials… and premiums paid for hazardous, arduous, or dirty work.").

108.    Consistent with Section 7(a) of the Fair Labor Standards Act, Plaintiff and those similarly situated are entitled to overtime pay equal to 1.5 times their *regular rate* of pay for hours worked in excess of forty (40) hours per week.

109.    Plaintiff and those similarly situated regularly worked in excess of 40 hours a week and were paid some overtime for those hours, but at a rate that did not include Defendants' shift differentials or bonuses as required by the FLSA.

110.    It is well settled that shift differential pay cannot be excluded from the regular rate

calculation. *Featsent v. City of Youngstown*, 70 F.3d 900, 904 (6th Cir. 1995); *see also O'Brien v. Town of Agawam,* 350 F.3d 279, 295 (1st Cir. 2003) ("The case law is unequivocal that shift-differential pay must be included in an employee's FLSA 'regular rate.'").

111.    Likewise, the U.S. Supreme Court had held that shift differential pay cannot be mislabeled as an overtime premium. *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 466 (1948) ("a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium.").

112.    Moreover, to the extent that any of Defendant's premium compensation paid to Plaintiff, and those similarly situated, could be qualified and applied as a credit under 29 U.S.C. §§ 207(7)(h), those credits may only be applied to the same workweek or work period in which the premiums were paid. *Herman v. Fabri-Centers of Am., Inc*., 308 F. 3d 580, 590-92 (6th Cir. 2002).

113.    In a Department of Labor Opinion Letter dated December 23, 1985, the Deputy Administrator stated: "We wish to point out that the surplus overtime premium payments, which may be credited against overtime pay pursuant to section 7(h) of [the] FLSA, may not be carried forward or applied retroactively to satisfy an employer's overtime pay obligation in future or past pay periods." *Opinion Letter Fair Labor Standards Act* (FLSA), 1985 WL 304329 at 3 (1985).

114.    Defendant paid Plaintiffs and all other similarly situated hourly employees an hourly wage, plus incentive compensation in the form of non-discretionary bonuses and shift premiums. *See e.g.*, **Exhibit A**, Plaintiff's April 28, 2023 Earnings Statement.

115.    Under the FLSA, the "regular rate" at which an employee must be paid includes "***all remuneration*** for employment paid to, or on behalf of, the employee," divided by hours worked in a workweek. 29 U.S.C. § 207(e) (emphasis added).

116.    Defendant's non-discretionary bonuses, shift differentials, or other remuneration do not fall within any of the statutory exclusions from the regular rate as provided in 29 U.S.C. §§ 207(e)(1)-(8).

117.    However, Defendant failed to incorporate any shift differentials or bonuses into its hourly employees' regular hourly rate calculation, resulting in *prima facie* violations of the FLSA.

118.    For example, Plaintiff's paystub dated April 28, 2023 shows an attendance bonus of $175.00. However, that paystub does not include Plaintiff's bonus payment in the regular rate calculations; rather, all of Plaintiff's overtime was paid at 1.5 times his *base rate* of pay. [9] (*See* **Exhibit A**).

119.    Consequently, Plaintiffs were paid at artificially low overtime rates.

120.    Defendant violated the FLSA's overtime provisions, 29 U.S.C. § 207, by systematically failing to include all remuneration in Plaintiffs' regular rates of pay when computing overtime pay, specifically, nondiscretionary incentive compensation and shift premiums.

## FLSA COLLECTIVE ACTION ALLEGATIONS

121.    Plaintiff brings this action pursuant to 29 U.S.C. § 216(b) of the FLSA on his own behalf and on behalf of:

> *All current and former hourly employees who worked for Bimbo Bakeries USA, Inc. at any of its manufacturing facilities during the last three years.*

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition if necessary.

122.    Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate

---

[9] Plaintiff's paystubs calculate overtime based on a rate of $35.47, exactly 1.5 times Plaintiff's $23.65 base rate of pay. This overtime rate clearly fails to include any amounts for Plaintiff's quarterly attendance bonus as required by the FLSA.

Plaintiff and the members of the FLSA Collective.

123.    Excluded from the FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

124.    Consistent with Defendant's policy and pattern or practice, Plaintiff and the members FLSA Collective were not paid premium overtime compensation for all hours worked over 40 in a workweek.

125.    Defendant assigned and/or was aware of all of the work that Plaintiff and members of the FLSA Collective performed.

126.    As part of their regular business practices, Defendant intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff and the members of the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

      a.    Willfully failing to pay their employees, including Plaintiff and the members of the FLSA Collective, premium overtime wages for all hours worked in excess of 40 hours per workweek;

      b.    Willfully failing to record all of the time that their employees, including Plaintiff and the members of the FLSA Collective, worked for the benefit of Defendant; and

      c.    Willfully failing to include shift premiums, incentive bonuses, or other remuneration into the required regular rate calculation.

127.    Defendant is aware or should have been aware that federal law required them to pay Plaintiff and the members of the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek and at rates that included shift premium pay.

128.    Defendant's unlawful conduct has been widespread, repeated, and consistent.

129.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b). The employees on behalf of

whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policies, or plans; and (d) their claims are based upon the same factual and legal theories.

130.    The employment relationships between Defendant and every proposed FLSA Collective member is the same. The key issues - the amount of uncompensated pre-shift donning and walking time, post-shift doffing and walking time, and regular rate violations - do not vary substantially or materially among the proposed FLSA Collective members.

131.    The members of the FLSA Collective would benefit from the issuance of a Court-supervised notice of this lawsuit and the opportunity to join it.

132.    Court-supervised notice should be sent to the members of the FLSA Collective pursuant to 29 U.S.C. § 216(b).

133.    Those employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

134.    Plaintiff estimates the proposed FLSA Collective, including both current and former employees over the relevant period, will include thousands of workers. The precise number of FLSA Collective members should be readily ascertainable from a review of Defendant's personnel and payroll records.

## RULE 23 PENNSYLVANIA CLASS ACTION ALLEGATIONS

135.    Plaintiff Hollen brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on his own behalf and on behalf of:

*All current and former hourly employees who worked for Bimbo Bakeries USA, Inc. at any of its manufacturing facilities during the applicable statute of limitations period in Pennsylvania.*

(hereinafter referred to as the "Rule 23 Pennsylvania Class"). Plaintiff Hollen reserves the right to

amend the putative class definition if necessary.

136.     This action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

137.     The members of the Rule 23 Pennsylvania Class are so numerous that joinder of all Rule 23 Pennsylvania Class members in this case would be impractical. Plaintiff Hollen reasonably estimates there are dozens, if not hundreds, of Rule 23 Pennsylvania Class members. Rule 23 Pennsylvania Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

138.     There is a well-defined community of interest among Rule 23 Pennsylvania Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Pennsylvania Class. These common legal and factual questions include, but are not limited to, the following:

a.     Whether the time Rule 23 Pennsylvania Class members spent on pre-, mid-, and post-shift activities "off the clock" for each shift is compensable time;

b.     Whether Rule 23 Pennsylvania Class members are owed wages for time spent performing off-the-clock work activities, and, if so, the appropriate amount thereof;

c.     Whether Defendant failed to include all remuneration in Rule 23 Pennsylvania Class members' regular rates of pay when computing overtime pay, specifically, shift premium and non-discretionary bonus pay;

d.     Whether Rule 23 Class members are owed wages for Defendant's failure to include all remuneration in Rule 23 Pennsylvania Class members' regular rates of pay when computing overtime pay, specifically, shift premium and non-discretionary bonus pay, and if so, the appropriate amount thereof.

139.     Plaintiff Hollen's claims are typical of those of the Rule 23 Pennsylvania Class in that he and all other Rule 23 Pennsylvania Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiff Hollen's claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Pennsylvania Class members' claims, and his legal theories are based on the same legal

theories as all other Rule 23 Pennsylvania Class members.

140.     Plaintiff Hollen will fully and adequately protect the interests of the Rule 23 Pennsylvania Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff Hollen nor his counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Pennsylvania Class.

141.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Pennsylvania Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

142.     This case will be manageable as a class action. Plaintiff Hollen and his counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

143.     Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

144.     Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Pennsylvania Class and declaratory relief is appropriate in this case with respect to the Rule 23 Pennsylvania Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

## RULE 23 NATIONWIDE CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on his own behalf and on behalf of:

*All current and former hourly employees who worked for Bimbo Bakeries USA, Inc. at any of its manufacturing facilities during the applicable statute of limitations period.*

(hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiff reserves the right to amend the putative class definition if necessary.

146.    The Rule 23 Nationwide Class members are so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiff reasonably estimates there are thousands of Rule 23 Nationwide Class members. Rule 23 Nationwide Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

147.    There is a well-defined community of interest among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions include, but are not limited to, the following:

a.    Whether the time Rule 23 Nationwide Class members spent on pre-, mid-, and post-shift doffing and walking activities is compensable time;

b.    Whether Rule 23 Nationwide Class members are owed wages for time spent performing pre-, mid-, and post-shift doffing and walking activities, and if so, the appropriate amount thereof;

c.    Whether Defendant failed to include all remuneration in Rule 23 Nationwide Class members' regular rates of pay when computing overtime pay, specifically, shift premium and non-discretionary bonus pay;

d.    Whether Rule 23 Class members are owed wages for Defendant's failure to include all remuneration in Rule 23 Nationwide Class members' regular rates of pay when computing overtime pay, specifically, shift premium and non-discretionary bonus pay, and if so, the appropriate amount thereof; and

      e.    Whether Defendant's non-payment of wages for all compensable time and regular rate violations constitutes breach of contract or unjust enrichment.

148.    Plaintiff's claims are typical of the Rule 23 Nationwide Class members' claims because Plaintiff and all other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiff's claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Nationwide Class members' claims, and his legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

149.    Plaintiff will fully and adequately protect the interests of the Rule 23 Nationwide Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

150.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

151.    This case will be manageable as a class action. Plaintiff and his counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

152.    Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A.*, 559 U.S. at 398 ("By its

terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

153.    Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.

<u>**COUNT I**</u>
<u>**VIOLATION OF FLSA, 29 U.S.C. § 201 *et seq*.**</u>
<u>**FAILURE TO PAY OVERTIME WAGES**</u>
<u>**(29 U.S.C. § 216(b) Collective Action)**</u>

154.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

155.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

156.    At all times relevant to this action, Plaintiff and the members of the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

157.    Plaintiff and the members of the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

158.    Plaintiff and the members of the FLSA Collective either: (1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

159.    At all times relevant to this action, Defendant "suffered or permitted" Plaintiff and the members of the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

160.    At all times relevant to this action, Defendant required Plaintiff and the members of the FLSA Collective to perform unpaid off-the-clock work in connection with their donning,

doffing, and walking activities, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

161.    The off-the-clock work performed every shift by Plaintiff and the members of the FLSA Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

162.    In workweeks where Plaintiff and other FLSA Collective members worked over 40 hours, Defendant failed to compensate Plaintiff and the FLSA Collective members for the unpaid off-the-clock work time, and all other overtime, at the federally mandated rate of one and one-half times each employee's regular hourly wage. 29 U.S.C. § 207.

163.    Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have determined how long it takes Plaintiff and the members of the FLSA Collective to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly paid Plaintiff and the members of the FLSA Collective for these work activities, but deliberately chose not to.

164.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs, reasonable attorneys' fees, and pre- and post-judgment interest.

### COUNT II
### (On Behalf of the Rule 23 Pennsylvania Class)
### VIOLATIONS OF THE PENNSYLVANIA MINIMUM WAGE ACT,
### 43  P.S. §§ 333.101, *et seq.* -- FAILURE TO PAY OVERTIME

165.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

166.    Defendant is an employer covered by the PMWA, and Plaintiff and the class members are employees entitled to the PMWA's protections.

167.    The PMWA requires Defendant to pay Plaintiff and the other class members minimum wages and overtime premium compensation "not less than one and one-half times" the regular rate of pay for all hours worked over 40 per week. *See* 43 P.S. §333.104(c).

168.    Defendant violated the PMWA by failing to pay Plaintiff and other class members overtime premium compensation for time associated with the tasks described in paragraph 14 above during weeks in which such time was worked above the 40 hour overtime threshold.

169.    As discussed herein, Defendant had a binding and valid contract with Plaintiff and every other Rule 23 Pennsylvania Class member to pay each employee for each hour they worked at a pre-established (contractual) regular hourly rate, plus any overtime pay required by applicable law, in consideration of the work duties Plaintiff and the Rule 23 Pennsylvania Class members performed on Defendant's behalf.

170.    Evidence of this contract includes Defendant's letters offering employment, the employee handbook, pay statements, and other documentary evidence in Defendant's possession.

171.    Upon information and belief, each Rule 23 Pennsylvania Class member, including Plaintiff, was contractually entitled to a minimum hourly rate within the applicable period, in addition to applicable overtime premium.

172.    Plaintiff and every other Rule 23 Pennsylvania Class member accepted the terms of Defendant's contractual promises contained in Defendant's offer letters, and performed under the contracts by doing their jobs and carrying out the work they performed each shift, which included the unpaid off-the-clock work that was required of them in connection with pre-, mid-, and post-shift work described herein.

173.    Defendant breached its contractual promises by failing to pay Plaintiff and the Rule 23 Pennsylvania Class for all wages (regular and overtime) owed.

174.    Plaintiff and the Rule 23 Pennsylvania Class also did not receive accurate wage statements that detailed each hour worked and their rate of pay because Defendant failed to include the compensable time discussed herein in the paystubs provided to Plaintiff and the Rule 23 Pennsylvania Class and improperly calculated Plaintiff's overtime rate by failing to use the proper regular rate.

175.    Defendant violated the PMWA by regularly and repeatedly failing to compensate Plaintiff and the Rule 23 Pennsylvania Class for the time spent on the work activities described in this Complaint and at the proper overtime rate.

176.    As a result, Plaintiff and the Rule 23 Pennsylvania Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiff and the Rule 23 Pennsylvania Class are entitled to recover unpaid wages owed, liquidated damages, costs and attorneys' fees, and other appropriate relief under the PMWA at an amount to be proven at trial.

<u>**COUNT III**</u>
<u>**BREACH OF CONTRACT**</u>
<u>**(On Behalf of the Rule 23 Nationwide Class)**</u>

177.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

178.    At all times relevant to this action, Defendant had a binding and valid contract with Plaintiff and every other Rule 23 Nationwide Class member to pay each employee for each hour they worked at a certain hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed on Defendant's behalf.

179.    Defendant's contractual promises to pay Plaintiff and each Rule 23 Nationwide Class member's applicable hourly rate is evidenced by, among other things, each earnings statement issued to Plaintiff and the Rule 23 Nationwide Class members.

180.    Plaintiff and every other Rule 23 Nationwide Class member accepted the terms of Defendant's contractual promises and performed under the contract by doing their jobs and

carrying out the work they performed each shift, including the unpaid off-the-clock work that was required of them, accepted by Defendant, and that they performed, in connection with the donning, doffing, and walking activities described herein, as well as Plaintiff and every other Rule 23 Nationwide Class members' regular rates of pay and corresponding overtime rates.

181.    By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, as well as failing to properly pay their regular rates of pay, and corresponding overtime rates, Defendant systematically breached its contracts with Plaintiff and each Rule 23 Nationwide Class member.

182.    Plaintiff's and the Rule 23 Nationwide Class members' remedies under the FLSA are inadequate in this case to the extent Defendant paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure "gap time" claims) and to the extent the limitations period on these claims is longer than that under the FLSA.

183.    As a direct and proximate result of Defendant's contractual breaches, Plaintiff and the Rule 23 Nationwide Class members have been damaged in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of the Rule 23 Nationwide Class)**

184.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

185.    This Count is pled in the alternative to Count III, *supra*, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

186.    At all times relevant to this action, Defendant promised Plaintiff and every other Rule 23 Nationwide Class member a certain hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed for the benefit of Defendant.

187.    Plaintiff and every other Rule 23 Nationwide Class member relied upon Defendant's

promise for this rate and performed by doing their jobs and carrying out their required work duties.

188.    By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly rate for the off-the-clock work they performed each shift, Defendant was unjustly enriched.

189.    Additionally, by failing to properly pay Plaintiff and every other Rule 23 Nationwide Class member their correct regular rates of pay and corresponding overtime rates, Defendant was unjustly enriched.

190.    Plaintiff and the Rule 23 Nationwide Class members performed off-the-clock work tasks at the request of, without objection by, and for the benefit of, Defendant, and conferred a benefit on Defendant by doing so.

191.    Defendant appreciated, was aware of, received, and accepted the above-referenced off-the-clock work services from Plaintiff and every other Rule 23 Nationwide Class member and enjoyed the benefits derived therefrom, including increased profits, without having paid for the same.

192.    Upon information and belief, Defendant used the monies owed to Plaintiff and every other Rule 23 Nationwide Class member to finance their various business ventures or pay their equity owners.

193.    Defendant has been unjustly enriched by the retention of monies received pursuant to the services Plaintiff and the Rule 23 Nationwide Class performed for Defendant's benefit, without having paid Plaintiff and the Rule 23 Nationwide Class for the same.

194.    Plaintiff and the Rule 23 Nationwide Class suffered detriment due to Defendant's failure to pay them for the off-the-clock work described herein, in that Plaintiff and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a

profitable manner.

195.    As a direct and proximate result of Defendant's actions, Plaintiff and every other

Rule 23 Nationwide Class member suffered damages, including but not limited to, loss of wages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the putative FLSA Collective

and Rule 23 Classes, requests judgment as follows:

a.    Certifying this case as a collective action under 29 U.S.C. § 216(b) with respect to Plaintiff's FLSA claim (Count I);

b.    Certifying this action as a class action (for the Rule 23 Pennsylvania Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiff's Pennsylvania state law claims (Count II);

c.    Certifying this action as a class action (for the Rule 23 Nationwide Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiff's breach of contract and unjust enrichment claims (Counts III-IV);

d.    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, email addresses, phone numbers and dates and location of employment of all FLSA Collective members, and permitting Plaintiff to send notice of this action to all those similarly situated individuals, apprising the FLSA Collective members of their rights by law to join and participate in this lawsuit;

e.    Designating Plaintiff as the representative of the FLSA Collective and the Rule 23 Classes, and undersigned counsel as Class counsel for the same;

f.    Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

g.    Declaring Defendant's violations of the FLSA were willful;

h.    Declaring Defendant violated the Pennsylvania Minimum Wage Act;

i.    Declaring Defendant's violations of the Pennsylvania Minimum Wage Act were willful;

j.    Declaring Defendant breached its contracts with Plaintiff and the Rule 23 Nationwide Class members (or, in the alternative, that Defendant was unjustly enriched) by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

k.    Granting judgment in favor of Plaintiff and against Defendant and awarding Plaintiff and the FLSA Collective and the Rule 23 Classes the full amount of damages and liquidated damages available by law;

l.    Awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

m.    Awarding pre- and post-judgment interest to Plaintiff on these damages; and

n.    Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, by and through his attorneys, hereby demands a trial by jury under Fed. R. Civ. P. 38.

Date:  November 19, 2024                    Respectfully submitted,

*/s/ Adam S. Levy*
Adam S. Levy (PA Attorney No. 66866)
Law Office of Adam S. Levy, LLC
P.O. Box 88
Oreland, PA 19075
(267) 994-6952
adamslevy@comcast.net

Kevin J. Stoops (P64371)
Albert J. Asciutto (P82822)
**SOMMERS SCHWARTZ, P.C.**
One Town Square, 17th Floor
Southfield, Michigan 48076
(248) 355-0300
kstoops@sommerspc.com
aasciutto@sommerspc.com

Jonathan Melmed (CA SBN 290218)
Meghan Higday (332908) (CA SBN 334626)
**MELMED LAW GROUP, P.C.**
1801 Century Park East, Suite 850
Los Angeles, CA 90067
(310) 824-3828
jm@melmedlaw.com
mh@melmedlaw.com

*Attorneys for Plaintiffs, the Proposed Collective,*
*and the Putative Classes*

# Exhibit A



CO
884

007227-007198

Bimbo Bakeries USA, Inc.
10 Fox Run Rd
Ste 1
Drums PA 18222

## Earnings Statement

EMPLOYEE ID

Period B. . _                    000199131

CO                    007228-007199
884

Bimbo Bakeries USA, Inc.
10 Fox Run Rd
Ste 1
Drums PA 18222

## Earnings Statement

EMPLOYEE ID              000199131
                         Page 001 of 001
Period Beg/End:          04/16/2023 - 04/22/2023
Check Date:              04/28/2023
Check Number:            0037261180
Batch Number:            230425884160

Gerald R Hollen

Payroll inquiry NAPayroll@grupobimbo.com
Online portal address www.myadp.com
Job Title: Process Technician Lead,Production.
For inquiries on this statement please call: 844-724-3292
Total Hours Worked:      49.31
Basis of Pay:            Hourly
Pay Rate:                23.6500

| Earnings | Rate | Hours/ Units | This Period | Year-to-Date |
|---|---|---|---|---|
| **Earnings** | | | | |
| Holiday | | | 0.00 | 567.60 |
| Personal Day | | | 0.00 | 1135.20 |
| Vacation | | | 0.00 | 1400.16 |
| Hourly Pay | 23.65 | 40.00 | 946.00 | 8939.70 |
| Hourly Pay OT | 35.47 | 9.31 | 330.28 | 3172.60 |
| Trainer Prem | | | 0.00 | 12.00 |
| Attendance Bonus | | | 0.00 | 350.00 |
| In Lieu of Vac | | | 0.00 | 218.62 |
| Gross Pay | | | 1276.28 | 15795.88 |

| Tax Deductions | | This Period | Year-to-Date |
|---|---|---|---|
| Federal Tax | | 131.86 | 1646.11 |
| Carlisle | | 6.22 | 76.40 |
| OPT Carlisle | | 1.00 | 15.00 |
| PA SD Carlisle Asd | | 13.69 | 168.14 |
| PA Unemployment | | 0.90 | 11.06 |
| Social Security | | 77.14 | 947.59 |
| Medicare | | 18.04 | 221.61 |
| PA State Tax | | 38.20 | 469.20 |
| Total Tax Deductions | | 287.05 | 3555.11 |

Imputed Income

| Other Deductions | This Period | Year-to-Date |
|---|---|---|
| **Pre-Tax Deductions** | | |
| Med Pre | 30.00 | 480.00 |
| Vis Pre | 2.01 | 32.16 |
| Union 401k | 51.05 | 631.83 |
| Total Pre-Tax Deduc | 83.06 | 1143.99 |
| **Post-Tax Deductions** | | |
| UN Due | 0.00 | 178.00 |
| Total Post Tax Dedu | 0.00 | 178.00 |
| Net Pay | 906.17 | 10918.78 |

© 1998, 2005, ADP, INC. All Rights Reserved.

TEAR HERE



CO
884

007227-007198

# Earnings Statement

Bimbo Bakeries USA, Inc.
10 Fox Run Rd
Ste 1
Drums PA 18222

EMPLOYEE ID

| | 000199131 |
| --- | --- |
| | Page 001 of 001 |
| Period Beg/End: | 04/16/2023 - 04/22/2023 |
| Check Date: | 04/28/2023 |
| Check Number: | 0037261148 |
| Batch Number: | 230425884160 |

Payroll inquiry NAPayroll@grupobimbo.com
Online portal address www.myadp.com
Job Title: Process Technician Lead.Production.
For inquiries on this statement please call: 844-724-3292

Gerald R Hollen

Basis of Pay:        Hourly
Pay Rate:            23.6500

| Earnings | Rate | Hours/ Units | This Period | Year-to-Date |
| --- | --- | --- | --- | --- |
| **Earnings** | | | | |
| Holiday | | | 0.00 | 567.60 |
| Personal Day | | | 0.00 | 1135.20 |
| Vacation | | | 0.00 | 1400.16 |
| Hourly Pay | | | 0.00 | 8939.70 |
| Hourly Pay OT | | | 0.00 | 3172.60 |
| Trainer Prem | | | 0.00 | 12.00 |
| Attendance Bonus | | | 175.00 | 525.00 |
| In Lieu of Vac | | | 0.00 | 218.62 |
| Gross Pay | | | 175.00 | 15970.88 |
| | | | | |
| **Tax Deductions** | | | | |
| Federal Tax | | | 36.96 | 1683.07 |
| Carlisle | | | 0.88 | 77.28 |
| OPT Carlisle | | | 0.00 | 15.00 |
| PA SD Carlisle Asd | | | 1.93 | 170.07 |
| PA Unemployment | | | 0.12 | 11.18 |
| Social Security | | | 10.85 | 958.44 |
| Medicare | | | 2.54 | 224.15 |
| PA State Tax | | | 5.37 | 474.57 |
| Total Tax Deductions | | | 58.65 | 3613.76 |

| Other Deductions | This Period | Year-to-Date |
| --- | --- | --- |
| **Pre-Tax Deductions** | | |
| Med Pre | 0.00 | 480.00 |
| Vis Pre | 0.00 | 32.16 |
| Union 401k | 7.00 | 638.83 |
| Total Pre-Tax Deduc | 7.00 | 1150.99 |
| | | |
| **Post-Tax Deductions** | | |
| UN Due | 0.00 | 178.00 |
| Total Post Tax Dedu | 0.00 | 178.00 |
| | | |
| Net Pay | 109.35 | 11028.13 |

**Imputed Income**

Exhibit B

## CONSENT TO JOIN

1.    Pursuant to the Fair Labor Standards Act, 29 U.S.C. §216(b), I hereby consent to join and act as a plaintiff in this lawsuit.

2.    I worked for Defendant(s) as an hourly employee and I agree to be bound by any adjudication or court rulings in this lawsuit, whether favorable or unfavorable. I understand that reasonable costs expended by Plaintiffs' counsel on my behalf will be deducted from any settlement or judgment amount on a pro-rata basis among all other plaintiffs. I understand that Plaintiffs' counsel will petition the Court for an award of attorneys' fees from any settlement or judgment.

3.    I hereby designate the Sommers Schwartz, P.C. and Melmed Law Group P.C. law firms to represent me in this lawsuit.

Signature:    _____

Print Name:    Gerald R. Hollen
_____

Date Signed:    2/27/2024
_____